Good morning. Illinois Appellate Court First District Court is now in session. The Third Division, the Honorable Justice Nathaniel House presiding. Case number 1-9-2-5-2-1, Ronald Tufo versus Richard Tufo. Good morning. This case is being held via Zoom because of the COVID situation. Therefore, we have some special procedures. We are going to allow each side to have 10 minutes of uninterrupted presentation, followed by questioning and interned by the members of the court. And the appellant may reserve a few minutes for rebuttal. With the parties who are going to make a presentation, please state their names and state the party they represent, beginning with the appellant. Good morning, Your Honor. My name is William Siriano, and I represent the plaintiff appellant in this case. Good morning, Your Honor. Patrick Keating. I represent Richard Tufo, the appellee here, and the defendant below. Thank you. Do either of you have any questions regarding the procedure we're going to follow? No, Your Honor. No. Okay. Okay. We're going to try to stick with the timelines provided because we do have other cases on the docket this morning. So, Mr. Siriano, you may begin when you're ready. Oh, may it please the court. As I said, my name is William Siriano, and I represent the plaintiff appellant in this case, Ronald Tufo, individually and derivatively on behalf of discount fence. And I think this case arises from the mismanagement and self-dealing by the defendant appellee, Richard Tufo, of discount fence. Richard was a 50% shareholder. He was the president of discount fence, and he controlled all aspects of the business of discount fence. The only other shareholder of discount fence prior to my client obtaining shares in September of 2013 was Luella Tufo, who is the mother of both Ronald and Richard. And as I said, she transferred her shares to Ronald in September of 2013. So, I think this case raises some fundamental questions that could have a drastic impact on the ability of shareholders to bring shareholder derivative actions, particularly in closed corporations. And from a procedural standpoint, Your Honors, no, this case was tried before. Judge Dacobias, his ruling is a 50-page ruling. It's in the appendix of this case. But in addition to that ruling, there were two other rulings made in November of 2017 that are also in the appendix of this case. One of those denied a motion brought by Richard Tufo for summary judgment. And in that order, Judge Dacobias made some findings with respect to defenses that Richard had raised for some objections. And one of them was that Judge Dacobias ruled that because Richard had not raised his objection based on standing to the statutory derivative action, that he had waived that defense. In addition, he found that he had waived his standing objection to the breach of fiduciary count, which was count for the complaint, because he hadn't timely raised that defense either. And he also concluded that Richard's claims were, or Ronald's claims rather, were not barred by the statute of limitations because Luella had not authorized Richard's conduct. And she was only generally aware of what was going on. And finally, the court rejected Richard's argument that the production of books and records mooted the claim for an accounting. Not only did the judge make those rulings, but then after that, there was a motion for reconsideration, which Judge Dacobias denied. And I have great difficulty resolving that earlier ruling with what ultimately the court said in its final order. But this was a family business and it was run by Richard. And Ronald was only an employee up until he obtained his shares. He never saw financials from the corporation. He never saw tax returns. He repeatedly asked Richard for information on what was happening with the corporation, because they would get to the end of each year and Richard would say, we have no money. And Ronald knew what the profit margin was on jobs, and he couldn't understand why there was no money. But every time he asked, he was told, mind your own business. Richard did not disclose what was happening with the company. What was happening fell within a variety of categories. One was Steelco and Roma, which were two corporations that Richard acquired. In the case of Steelco, the court found that Richard was 100% owner of Steelco and it manufactured, at least at one time, specialty fencing material. And Richard acquired that corporation for $225,000 and moved its stock to a warehouse next door to the South Holland office that Discount Fence had. And over the period of 1999 to 2013, which is what we had records for, Discount Fence paid Steelco over a million dollars. Now Richard's testimony, that was confusing as to what it was for. He said it was for rent, because part of that warehouse facility also stored Discount Fence materials. Other times he said, oh, it was for material. He was all over the board. We never did get an understanding of what the $1 million was actually paid for. And although Richard said, I never got a penny from Steelco, where did the $1 million go then? That was never explained at trial and really couldn't be explained. But the judge actually found that the acquisition of Steelco and its relationship with Discount Fence reached the fiduciary duties that Richard corporation. He found the same with respect to Roma, because Roma was a competing fence company that Richard acquired. And Roma actually somehow gained over $100,000 from Discount Fence, carried it as a loan for many, many years. And it was still being carried as a loan as of the time of trial in the amount of over $100,000. So that's one cluster of things. Another was additional rent that Richard charged to the corporation to Discount Fence on a piece of property that he owned in solely his name in Downers Grove, where he had established the second office. There was additional rent, not regular rent, but additional rent that he said, hey, if Discount Fence did well, I charged them additional rent. There was never an appraisal, never a fair market value determined with respect to that. In addition, he made loans to himself to acquire other properties and to acquire stocks and other investment opportunities. And what he would do is he acquired these stocks with Discount Fence money. And then he would use the additional rent, for example, to pay back those loans. So he was basically getting free as his personal piggy bank. There were also year-end adjusting entries that went unexplained, where the balances were just kind of leveled out at the end of the year. Nobody ever explained what those were for, although plaintiff's expert had serious questions about those. So when the court came around to ruling, the court ruled that Richard had breached his fiduciary duty with respect to Roman Steel Co. But he found that despite that breach, we hadn't proved specific damages arising from that. And that was despite the plaintiff's expert, Marie Dansu, who was a CPA and a forensic accountant. And she went through and identified in great detail exactly what it was that from the payments of that million dollars to Steel Co. that were improper. There was $137,000, for example, that Discount Fence paid Steel Co. that never hit the books of Steel Co. There was another $304,000 that wasn't accounted for by either Discount Fence or Steel Co. And there was other amounts that were ostensibly charged on the books of Steel Co. as Steel Co. didn't record that it received rent. So there were all sorts of things that she identified in particular, $49,000 being paid by Discount Fence directly to Steel Co.'s landlord. But nevertheless, the judge found we hadn't proved damages as a result of Richard's conduct. He similarly found that we lacked standing to assert a breach of fiduciary duty count and to assert a statutory derivative claim with respect to the latter, he said, because it was animosity between us and the defendant. And essentially, he reversed basically everything he had done in the November 2017 order that denied motion for summary judgment. So we raised six issues in our appeal. And I just want to highlight four things here, because I think these really would adversely impact the ability of wrong shareholders to bring a shareholder derivative actions. One is the idea of animosity, particularly in a closed corporation. The judge applied Caulfield and said, wherever there's animosity, you can't bring a shareholder derivative action. And he looked at the animosity between the plaintiff and the defendant. That's not what Caulfield does. About two minutes. Okay. Caulfield looks at the animosity between the plaintiff and other people in his class. With respect to specific damages, the court said, you don't get an accounting, you don't get any relief unless you prove specific damages, which I think, as I said, we did in any event. But he applied today's sushi to say, you got to prove specific damages. Fourthly, I think he said, we had no right to an accountant. He basically shifted the burden to us of proving that we needed an accounting by showing specific numbers, demonstrating that need, when in fact, there were all sorts of specific numbers. But in any event, I think that was wrong to shift that burden. And finally, he said, for purposes of an action, if you had just general knowledge, which again, contradicted his November ruling, that was enough to disqualify you from bringing a shareholder action. If you had general knowledge at the time you took your shares. I'll end it there for now. Thank you. All right. All right. Thank you. presiding over the over this case with the justices Eileen Burke and David Ellis, Justice Burke. Do you have any questions you'd like to ask? I do. Mr. Suriano, I want to make sure I understand your argument correctly. On the standing issue, the court did find that the defendant didn't have standing, or he had waived any allegation that you didn't have standing. But then the court seemed to revisit that issue. Later on, is it your position once the trial court found that defendant waived the standing issue that it could never be brought up again? Well, yes, my issue is he decided that definitively in on the motion for summary judgment, he denied a motion for reconsideration. And if he was going to allow that to come back in, there should have been some notice to the plaintiff. Hey, I'm going to reconsider my opinion to say he can do this now. Were you the trial attorney? Yes. Okay. So did that impact how you presented your case that ruling? And if so, how it did because it made in my mind, it made having to prove a lack of knowledge, for example, or to demonstrate to even elicit testimony related to that from either Richard or Luella or from Ronald, the lack of knowledge that he had, at the time that he acquired his shares. He said repeatedly, he was denied knowledge, he was denied access to books, he was denied any information from Richard. But I would have gone into that in more detail. And I thought that was a still a viable defense. Okay, so the court found that many of the allegations that you were bringing were based on things that occurred prior to and I want to get it right. Ronald, prior to Ronald becoming a shareholder, is that correct? Correct. Okay. And that didn't change one way or another. During the course of that, that that was still true. The allegations were the same that and the time period of when they occurred was the same that correct? That would be that would be true. Okay. And, and that's why it was important that the judge, if he was going to allow a standing defense, that we'd be able to then explain as to when it was that we obtained knowledge of those things, and how we got it. Okay. Go ahead. I get it. I get where you're going. Okay. Let's move on to the accounting. The judge's position seemed to have been that through discovery on this case, you've got every document, every piece of information that you would have gotten in an accounting. So therefore, an accounting wasn't necessary. Is that correct? That was his position. And tell me what you didn't get in discovery that you would have gotten from an account. What we didn't get was, there was a $137,000 never hit the books of Steel Co. We got nothing related to that. Okay. The $304,000 that was not booked on either end. We got no information related to that what was what it was for. And because of that, do you believe that that's part of the reason why you couldn't establish specific damages that the court found that, yes, the defendant breached the fiduciary duty, but you didn't establish all your specific damages? Well, one, I don't think we're required to establish specific damages to the level that the judge required. But secondly, yes, I do think that if you're going to impose that kind of burden on the plaintiff to prove every specific damage that he's claiming that he suffered, then yes, we needed an accounting from Richard, an explanation from him as to what those particular transactions, why they were, and what they meant. And our expert testified to that. Okay. And then my last question is the judge came down finding that Ronald had unclean hands, that he was kind of doing the same kind of thing that Richard was. And so therefore he was not entitled to recovery. How do you respond to that? The only evidence in this case of unclean hands, as the court saw it, was a transaction way in the past that was approved by Richard, where my client made a trip to Mexico and charged to the company. There was another instance where the testimony was that my client had acquired a condominium, but it was in the name of the corporation as well. And to say that those were like the kinds of things that Richard did, I think was just wrong. And in addition, there were all sorts of things that Richard did that had no involvement by my client whatsoever. And I think the case law that we cited in our initial brief and in our response says there's got to be a connection between our unclean hands and the conduct that we're complaining about. And I don't think there was here and there was nothing established that demonstrated that. Thank you, Mr. Soriano. Those are my only questions. Okay. Thank you, Justice Burke. Justice Ellis, do you have any questions? Just a few. Thank you. Good morning, Mr. Soriano. Morning, Judge. Thank you for your presentation. I'm interested in this ruling on summary judgment where the trial court made a statement about a waiver of the standing argument. So, first of all, a denial of a motion for summary judgment is interlocutory in nature, right? It's not a final ruling. And judges can reconsider interlocutory rulings, can't they? And he did. And he denied the motion. But he's within his rights to reconsider and come to the conclusion that standing is a viable defense. Can't he do that? I think to do it after the trial was prejudicial. Okay. Well, let's stay on that for a second. So, by what rubric do we assess this? Under what legal framework? Questions of standing are often questions of law. Sometimes, like any other legal question, there could be some underlying facts that form the foundation. Here, you're not necessarily saying he erred in... If I understand, you tell me if I have this wrong. You're not saying it was wrong for him to find a lack of standing so much as you're saying the trial court led us to believe it was no longer an issue. We didn't litigate the case accordingly. We didn't think we had to prove standing. And then he surprises us on the back end with this ruling that dings us on standing. Is that your argument? Or are you also saying he erred in his ruling? I think it's both. But I do think the principal issue here is if you're going to strike a defense and say it's not only stricken, but it's stricken due to the failure to raise it in a timely manner, it doesn't seem to me that the wartime passing in any way improves or makes it more likely that the judge is going to reconsider that. It would seem to me that the passage of additional time would make the argument that that defense was weighed stronger, not less strong. And so there is some aspect here of the facts and the facts that the judge relied upon to strike the defenses in the first place were the passage of time. They weren't timely raised. Which really is a surprise argument, isn't it? I mean, to say you can't raise a defense at the last minute and expect the court to entertain it and the opposite party to have to address it. And so that seems to me to be a legitimate argument all the way through the case, is that that defense has been weighed. It's not been timely asserted. Nothing changes. No facts change on it. Okay. Um, in the proposed findings of fact and conclusions of law that were filed, I believe there were written submissions made to the court. Did your opponent argue lack of standing? I honestly, I don't recall, but I don't believe he did. Okay. Because then my next question, you may not know the answer to either, did you respond to that by saying, Hey, that's not an issue here. I mean, maybe I could make it simpler. Was there any discussion of standing in the proposed conclusions of law or findings of fact? Not that I recall, not from our end, certainly it was a defense that, and keep in mind judge Ellis, there, there has been no appeal taken from those summary judgment rulings. Why would he appeal that he would appeal on there's a cross appeal and he would appeal the, the, the, the judge's denial of the motion for summary judgment on the grounds that, that the defenses were timely raised. Didn't do that council. He got a ruling after a trial that he won on the standing argument. Why because, um, because we appealed, um, I understand your point. May I move on? Um, I want to give you a chance to say whatever you'd like to say, counsel, you go ahead. If you had something else to add. No, I'm, I'm finished. Okay. In the order in November of 2017, didn't the order itself suggest that standing was still an open question. Wasn't there language in the order where the court said that it would permit plaintiff to attempt to demonstrate that he had obtained his shares and discount fence before defendants actions were disclosed to the public. And before he was aware of the wrongdoing. And did it also say plaintiff can still establish he has standing to bring the claim here under the act. You're talking about the motion for reconsideration order. It may have been, I thought it was in the summer judgment or itself, but in any event, doesn't that language suggest this is still an open question. If, if the judge had not denied them the motion for modifications, he denied it. And, and so I would view that in the classic form of dicta is if you're going to allow it, say, you're going to allow it. And if you're, if you deny a motion for reconsideration after denying a motion for summary judgment, after finding it had been waived, um, I, I, I, you know, I think we're back at the same issue. Okay. Now, when you were talking about this before you were referring to him striking the defense, I always want to make sure that we are clear on our terms. Was there an affirmative defense filed in this case on standing and did the court strike it? Yes. He struck the affirmative defense. Yes. And did he do that in the summary judgment or is that somewhere else in the record? Uh, in the summary judgment, he said the affirmative defenses are stricken or this affirmative defense is stricken. Well, let me say it this way is the, um, um, the, the issue was summary judgment and the, the, the, uh, what was raised on the summary judgment motion is plaintiff is not entitled to relief because of a lack of standard. And the judge said, no, that defense has been waived. You can't raise it. And he did that both with respect to the stag story and the breach of fiduciary duty claims. Okay. Thank you very much for your, your answers. I'm I'm I'm done justice. Thank you, justice Ellis. Um, Mr. Suriano, uh, the Illinois constitution provides that the circuit courts have jurisdiction over all justiciable issues. And it's my understanding that in order to have a justiciable issue, you have to have a legitimate dispute between two parties who have a legitimate interest in the outcome of the litigation. In other words, standing. So standing actually is a part of, you have to have standing in order to have a justiciable issue and to have jurisdiction. So in reality, do you agree that a party defendant can never waive the issue of plaintiff standing? No, I don't. I, um, I suppose if, if, uh, a party truly has no interest in the litigation that would be raised as a, as an initial matter, as a, probably on a motion to dismiss, uh, or, or on some other, um, uh, an affirmative defense that would be tested. Um, but certainly tested prior to a trial. And in this case, it was tested prior to the trial. And the court found that, that there, that, that the lack of standing, uh, defenses were, had been waived. Um, so I, I understand what you're getting at judge, but I think if you're going to, to, to allow a case to go to trial, um, based on, uh, prior rulings of the court that essentially found standing, um, or at least said there was no legitimate defensive standing, then, um, then I think you have waived. I think it can be waived. Well, when the court denied the summary judgment, they merely proved that the defendant didn't, was unable to, uh, prove at that point that you lacked standing because it wasn't your burden to prove standing. They, they were just unable to prove you didn't have standing. That's the court found, but the court always had jurisdiction to, uh, amend its, its interlocutory orders. And furthermore, the court always has a duty, uh, to jealously guard its jurisdiction. And, uh, not withstanding any earlier pronouncements, they had a duty to make sure that they had a justiciable issue on the table. Isn't that true? Well, the court didn't just say, Hey, I'm making an interlocutory ruling that maybe you have standing, maybe you don't let's sort it out at trial. It's not what the court did. The court said the defense under the statute, under the derivative statute that we didn't lack, that we lack standing to assert that claim that had been waived and the defense that we did not have standing to assert a breach of fiduciary duty count that had been waived as well. I'm sorry to interrupt you, but maybe I can help you direct what you're arguing about. Your argument really is not the correctness of the judge's standing ruling at that point. Your argument is that the way the judge ruled on standing, uh, and then change his mind prejudiced you in the presentation, uh, of your case. Well, that is true. But as I said to, in response to judge Ellis, uh, judge house, um, I, the basis for the court saying that, that both of those defenses had been waived was a timeliness issue. And there, there was no change in timeliness between the time of his November, 2017 ruling and a ruling two years later that what changed, what possibly could have changed in his ruling of saying it wasn't timely then, but now it's timely now. All right. I have no further questions. Thank you. Uh, you can have a few minutes in rebuttal. Uh, Mr. Keating, you may, uh, go ahead. Uh, thank you, your honor. May it please the court. Um, the first thing I would like to respond to is, is the issue of shareholder standing. Um, this, the, the court made a lot of, uh, rulings that justified, um, uh, a defense judgment, but, uh, shareholder standing was certainly the, the, the simplest and cleanest way that the court could have resolved it. Um, I, I believe my, uh, uh, opposing counsel may be not recalling some of the details from the record, but, um, in the appendix on page 59 is where, uh, the court in the original summary judgment ruling addresses the standing issue. Now that he did rule that we had waived it because my predecessor counsel had not raised it as an affirmative defense in either of the first two answers. We filed, I believe a third amended, uh, we were given leave to file a third amended answer in affirmative defenses in March of 2017, shortly after we came into the case. The court gave us that leave. We filed, uh, and we included, uh, all the defenses that we raised here, including, uh, lack of standing under the business corporations act. And, uh, it was not stricken at that time. There was no motion to strike our affirmative defenses. But six months later, but six, I'm getting weird here, buzzing or something, but six months later, the, uh, the court did rule on summary judgment that we had waived those, uh, that affirmative defense. Waiver of course is a limitation on the parties. It is not a limitation on the court. Uh, I wish I had a site for that, but I'm sure you've heard it enough to, to believe the truth of that. But, uh, in page, uh, a 59 of the appendix, the, uh, the circuit court specifically says, uh, and I quote, because defendant denies that he misappropriated discount fences funds, the court would permit plaintiff to attempt to demonstrate that he obtained his shares and discount fence before defendants actions were disclosed to the public. And before he was aware of wrongdoing under the BCA plaintiff can still establish standing to bring his claims. So in the actual summary judgment order, the court didn't say he has standing. The court basically says, here's what you need to do at trial to establish standing. And really the, uh, BCA actually normally assumes that there will be a pre-trial evidentiary hearing if somebody wants to come in under the duped or innocent shareholder exception, the court, uh, here decided to sort of roll everything into the trial and decided at that point. And then on the motion for reconsideration, uh, on page 75 of the appendix, the court again says, uh, well, there, there are not, there are still questions of facts. So we would permit the, uh, plaintiff to establish that he had standing, uh, in response to, uh, judge Ellis's questions. Uh, we also did, uh, we, we weren't happy of course, with the, with the summary judgment ruling on standing and, and we never stopped bringing it up to the court. Uh, we raised it, uh, we raised it in our opening arguments pointing out that there had not yet been this pre-trial, uh, finding that according to the statute should have happened. And that was, uh, at page 114 of the record. And then we did, uh, in our pre-trial memorandum at, which is at, uh, pages 45, 13 and 14 of, uh, the common law record, we raised standing and we raised it again in our post-trial brief, uh, at pages 4604 and 4605. So, uh, I believe that the, the, the, the standing, the standing issue, standing isn't a standing, you can raise standing as an affirmative defense, but as I think the court alluded, standing is, is a, is a core conception of, of the ability to bring a lawsuit. And the court has its own obligation, I think, to determine if the parties before it have standing. Um, but in addition to standing, I think there were three other reasons in the, uh, in the court's judgment and that are apparent in the record why this court can and should affirm, uh, just Judge Jacobius's, uh, ruling. Uh, the first is that the, the court found and put in several points in its opinion that the plaintiff failed, uh, to meet its burden of proof in this case. And there, there was a little bit of dispute, but I think we cite to the case in our brief, Caduti versus Hellwig, which is an appellate case and also an older Supreme Court case, Bandringa versus Bandringa. And what those cases stand for is the proposition that when you have a case involving a fiduciary, uh, who is a controlling shareholder of a company or corporation, and there's no question here that Richard Thompson or Richard, uh, Tufo was a controlling shareholder of Discount Fence at the time that his mother was the other 50% shareholder. When you have that kind of a situation, it is not enough to simply say that there were transactions between the fiduciary in his personal capacity and the company, or in this case with companies that the fiduciary owned and his own company. That is not enough. That is how the plaintiff seemed to approach this case, that if they and their experts simply pointed out that money went from Discount Fence to Richard Tufo personally, as in the case of the lease of the Downers Grove property, or to companies that he's controlled, as in the case of Steelco, that that was all he needed to prove and that those amounts were the full measure of damages. But what Caduti versus Hellwig, what the cases in Illinois say is that it is the plaintiff's on the front end that there was an undue profit, and that that profit took place at the expense of the company. And that was what was never found on any of these issues by the circuit court. There was plenty of evidence about transfers, for example, between Steelco and Discount Fence. There was about a million dollars transferred over a 13 or 14-year period, which averages out to $70,000 a year. But the testimony in the case was that Steelco was established as a separate company because it was in a slightly different line of business. It was in manufacturing and wholesaling as opposed to retail installations. Richard, at the time that he acquired Steelco, was effectively in control of Discount Fence, but he admitted that he never took any money out of Steelco at any point, not his salary, not his loans, not his profit distributions. So to this day, he's never taken a dime out of it. And most importantly, their expert, Marie Dansu, also testified that she could trace no money that went from Steelco to Richard Tufo. What there was evidence in front of the court was that Steelco was set up in part as a, quote, that came in, not much because a lot of it was objected to by plaintiff because he contended that this was opinion testimony, but that there were substantial tax benefits to the transfers that were made between Steelco and Discount Fence. And those tax benefits accrued to Discount Fence. There was also testimony, Marie Dansu agreed, that there were legitimate transfers for purchases of Steelco product and then for storage of that product in Steelco's warehouse and for insurance. So there was no evidence at no point did the plaintiff ever say, well, here's the amount that was too much that went to Richard personally. The transactions were, there was no evidence that they were not arm's length. The same thing, for example, with the Downers Groves rent. There was plenty of expert testimony by both accounting experts that it's perfectly normal and perfectly acceptable in small businesses for shareholders to own property and then in turn rent that property to the companies of which they are shareholders, even if they are controlling shareholders. Leases are desirable, but not required. The only thing that is required is that the rent be set at arm's length and be set at a fair market value. The court went to great length in its opinion to point out that there was no evidence whatsoever that the total amount of rent, including additional rent, exceeded the fair market value of the rent on the property. And the court also pointed out that the other shareholder at all this time received even more in rent for owning the South Holland headquarters of the company. So there was nothing inherently wrong with the rent transactions. And it was plaintiff's burden to show that there was some sort of undue profit, but having done no sort of fair market analysis, they simply couldn't establish that. Same thing with shareholder loans are OK, that they can be done for any purpose. And the most important thing is that there be a promissory note and that there be interest and that they be paid back. And even Marie Dansu, the plaintiff's expert, admitted that Ronald paid back all of his loans. He did use those loans to invest in real estate. He did use those loans to invest in stocks, but he paid the loans back. And any profits that he made on the investments were his own profits. They were not profits that he achieved at the expense of the company. Discount fence was not a manager to wrap up of stock investments. The other two points that I would just raise very quickly is that the court found that the equities of the case generally did not favor Ronald Tufo. He basically acquired his shares for the purpose of bringing a shareholder derivative suit and for the purpose of maintaining it as a profitable ongoing enterprise. The court found that was wrong, not only in its uncleans hand finding, but I think that suffuses its opinion. And then the final point is I think the court here actually far from prejudicing the plaintiff, the circuit court here really bent over backwards to make sure that the plaintiff was able to get his claims to trial. And then when it allowed a lengthy break for the plaintiff's to obtain documents that she claimed she needed in order to reach some actual opinions in the case, the court gave an 11 month break and allowed plaintiff's expert everything she asked for. And the problem was when the case resumed in 2019, there was still no findings or opinions of any misappropriation of funds because there was no misappropriation of funds. And for that reason, we would ask the court to affirm the judgment. Happy to answer any questions. Thank you very much, Mr. Keating. Justice Burke, do you have any questions? Just one. Mr. Keating, would you agree with Mr. Soriano's opinion that of what his unclean hands finding was that it was insufficient to bar him from recovery? No, the case that some cases say that it has to be in the exact transaction complained of. This is not a case where there is a single transaction. This is a case in which the plaintiff is alleging a very broad pattern of misconduct and the loans are a big part of it. And yet the court found that Ron was just as happy to take shareholder, I guess, family member loans and use them to invest in real estate as the defendant was. Certainly the plaintiff never offered if he made any gains on his real estate investments to return that money, or he never thought that money should belong to discount fence. So I don't understand why he would claim that profits that Richard made in the stock market or in real estate investments belong to discount fence. So I don't agree. I think that because the unclean hands here were so pervasive and didn't just come after the lawsuit or after the acquisition of stock, but were part and parcel of Ron. Ron was doing the same things that Richard was largely. And so we think that that would have been an appropriate basis. I don't think that actually, if you read the court's opinion carefully, the court didn't say it was denying standing based on unclean hands, because there were already plenty of other reasons why the plaintiff didn't have standing. The court almost put it in as would have been well justified in unclean hands as well. It was really a superfluous argument in the opinion. Thank you. I have no other questions. Okay. Thank you, Justice Burke. Justice Ellis, do you have any questions? Just a couple. Morning, Mr Keating. Morning. So what is your response to what Mr Suriano had to say about the animosity question that he said that the trial court improperly understood that case and that name of that case is escaping me from the first field versus Packer. Thank you. Yeah. He says that that's not the kind of animosity that they meant their animosity between, you know, the person suing the company and the person running the company. Do you agree that? What is your response to that? I don't again, I think that in the context of this case, it probably wasn't strictly necessary for the court to even reach it. It was the court was saying and here's another reason why. But I do think that the plaintiff's brief said that the court misapplied it, but never exactly said how it was misapplied. And the Caulfield versus Packer case, in fact, said there were eight factors, but even a strong showing of a single factor could be enough. When you have a two shareholder company, that is going to create very interesting questions in terms of shareholder derivative suits, because the shareholder, the other shareholder for whom you're presumably bringing the action for the benefit is the person you're suing. I mean, basically, Ronald was saying Richard should pay back millions into the company. And then since we each own half the company, I now get half of those millions. But I don't Caulfield versus Packer's test is clear. And I don't think the court was at all wrong for applying it. Several of the other of the eight factors also appeared, although the court didn't discuss them at length. So that's relatively new law in Illinois, because Caulfield versus Packer sort of imported that common loss shareholder standing issue from Delaware law. But it's good law as far as I understand. Okay, let me ask you about standing again. So I heard you say that. And I think you called it the third amended affirmative defenses that whether it was a response to a new complaint, I don't think was the case. But of course, you have the right to amend your affirmative defenses and your answer. In your third version of that, you assert it was my first year honor, I was new to the case, I understand your clients, your clients. Now, of course, you can you can, when we talk about forfeiture and waiver, you can plead over arguments, right. And so sometimes even if you've lost a legal argument, you replete it for the purposes of preserving it, right. And, and my memory, it's a distant memory now of practice in circuit court is when you did that you even acknowledge it up front, you would put in an appeal, that kind of thing. When you say that you put in this standing argument, did you put in any language like that? I don't know, we never said we never pointed out it was, in our view, this was a case, Judge Jacobius was intimately familiar with the case, counsel, and I were in front of him all the time. And so no, I never said the this was previously, we never said in writing, I don't think this was previously decided against us, I kept raising the argument. And there are, there are many colloquies, often in the form of objections in the trial transcript, at which I said, you know, Judge, you know, I still have an issue with the fact that he didn't own shares at the time. That's definitely in the trial record. So and the court said, I know, but we're gonna, we're gonna get let this all come in and then decide it. And so I think, I think that the plaintiff's side had had plenty of notice all throughout from from November of 2017, through the filing of post trial motions, that it had to establish standing. And it couldn't rely on the fact that an untimely recitation of the standing standard, what had been deemed waived. Well, in the view of the trial court, though, right, the trial court had said it was untimely. And then after it was found to be untimely, you raised it again. That's correct. So between the time of that amended affirmative defense and trial, okay, between that period of time, which may have been part of that 11 month break, did you do anything else in writing? Was there any other occasion, you may not have had the standing? No, no, I didn't. I thought that the court's statement in the summary judgment ruling at a 59, that the plaintiff could still attain standing. And then really at a 75 on the reconsideration, the court had already told plaintiff standing isn't state you haven't won on standing. And the court in fact, gave the gave the plaintiff a blueprint for what it needed to do. And the Ronald Tufo admitted at the very beginning of his testimony, Oh, no, I was aware of these things for years and decades before I acquired this year. He was very upfront about that. Okay. But in terms of in writing, yes, it was in our pretrial memorandum, which again, is shortly before trial. And I did mention it in our opening arguments. Okay. Do you recall if in the pretrial memoranda, uh, Mr. Suriano, or, you know, that party at least, um, made any comment about the fact that this was a dead issue? I do not. I do not recall, um, there being any mention until I read the appellants brief, that, that the, the waiver of it precluded it from being addressed in the case. I don't, I don't recall any up, I could be wrong, but I really don't recall any opposition in their pretrial brief or in response to my opening arguments or in their closing, uh, brief. And you say that you mentioned standing in the opening statement at trial? Yes, I did. Do you recall any objections from, uh, Mr. Suriano or one of the attorneys, uh, to the effect that this issue was no longer before the court, it had already been decided? We certainly had a lot of objections in the case, but I don't recall that being one of them. Okay. All right. Thank you. Thank you. Thank you, Justice Ellis. Uh, I have nothing further, um, with Mr. Keating. Um, just, uh, Mr. Suriano, I promised you a few minutes, uh, for rebuttal. We may proceed. Well, let me say, uh, I appreciate your time today, judges. And they're, uh, one of the issues here, uh, related to standing. Um, the defense had been waived, um, and counsel represented that there was no evidence that we presented concerning the knowledge of Ronald Tufo at the time he acquired his shares. And, and I think it's an overreach to say that Mr. Tufo, Ronald Tufo, uh, freely admitted that he knew all about these things at the time he acquired his shares. There was no evidence, uh, that showed that he knew of more than 107, 137,000 going to Steelco that never made it to Steelco's account. No, uh, testimony and no evidence that he knew about $304,000 going to Steelco that was unaccounted for. No knowledge of, uh, uh, no evidence that discount, uh, offense paying Steelco's rent directly was anywhere within, uh, Mr. Tufo's can. Um, but Ronald Tufo said was, and this is the only thing, and I don't think this general knowledge is sufficient to deny standing. The only thing he said was they'd get to the end of the year and, and Richard would say, we don't have any money. And based on that, Ronald was concerned that, that obviously he should be because he was an employee and a member of the family that something was going on, but there was no specific knowledge. And the statute requires that there be knowledge of the actual conduct complained of, and there was no testimony, no evidence that he knew that. In addition, um, the, uh, saying that Ronald did the same things as Richard did is not supported in the evidence of this case. It was, as I said, a, a, a trip to Mexico many, many years ago and a condominium purchased in the it's the same kind of thing from the standpoint of unclean hands is just not supporting the evidence. And finally, I'd like to say that when they say there was no specific evidence of, uh, of, of, of Richard profiting at the expense of discount fence, there was, there was $137,000 to discount fence supposedly paid to Steelco that never got to Steelco. So Mr. Keating was very careful in saying, Richard said he never took a dime out of Steelco. That's that may be true. There was $137,000 that never got there. There's another $304,000 that was totally off the books now for them to say, Oh, we had to prove that, that those funds went to Richard. He was the a hundred percent shareholder and controller of Steelco where else would they have gone? Uh, and he never denied and never explained where those funds went. So I think based on, on the actual evidence in this case, rather than what we can speculate as to what may have been the tax advantages or anything like that is that Richard Tufo took money out of discount fence. He profited. Those funds should have been left in discount fence for the benefit of its shareholders, not for the benefit of Richard personally. And there was ample evidence to support both the amounts that were taken out and the, the, uh, the way they were taken out. So on, based on the actual evidence in this case, I don't believe Richard, uh, Ronald had standing for both purposes of a statutory claim and his fiduciary duty claim. The court found breaches of fiduciary duty. It went through and identified the areas of those breaches of fiduciary duty that, that Richard committed with respect to Steelco and Roma fence. And we prove that there, it was unrebutted that there were funds that came out of discount fence to Steelco that never went to Steelco, weren't accounted for on Steelco's didn't appear on either tax returns. And, and, and obviously went, went to the benefit of Richard, the a hundred percent owner of Steelco. And so based on that, I think this court needs to, to, to reverse the lower courts decision, send this back for Richard to account for the monies that went to Steelco and Roma where Richard got his personal loan that, that was a $402,000. That was still outstanding as of the time of trial and, and to force Richard to account for what it is that he did and where those funds went, uh, that, that went out to this from discount to Steelco Roma to himself on the, the, uh, the Downers Grove property as not normal rent, but additional rent, which was over and above what Richard said had been established as a reasonable rental value. So based on all of those facts, uh, I would encourage this court to reverse the trial court's decision and remand this case. Thank you. Uh, do either justice Burke or you just as Alice have any other questions based on what we just heard? No, no questions. Maybe just a couple. I'll try to be brief. Um, Mr. Suriano, um, if, had you known, um, that standing was going to be raised at trial, how would you have conducted the trial differently? I think I am harmed by this. I think I answered judge Burke to some extent. I if, if, if I had known and there, there were separate standing issues with respect to the breach, if I do share a duty claim and the statutory claim, but if the court had said, I'm reconsidering and yeah, the standing issue is still in play here. Um, and, uh, can be raised as a defense in this case. Then I think the issue of knowledge of what specifically Ronald knew and when to present a different testimony. And I think the issue of how we would have, um, uh, examined Luella Tufo would have been different as well. Although frankly, she knew very little. She knew very little about what happened with this conference, but, but her relationship to Richard and what she knew about what he was doing as well as what Ronald knew. And when he knew it would have been a, a bigger highlight in the case. Okay. Do you recall objecting at trial? Anytime standing was brought up, like for example, in the opening statement? Uh, I did not object, uh, on the opening statement because I, as far as I was concerned that defense had been already waived and determined to be waived. Um, did you, did you say anything of, to that effect in, in your opening statement or at the closing argument or any other time? I really don't recall saying it, um, in, in, in either event, I thought it was a dead issue. Okay. That's all I have. Thank you. Thank you very much. Uh, gentlemen, this case was well argued and well briefed. I know it's a difficult situation, uh, a dispute between relatives that you'd both, uh, did very well and the case will be taken under advisement and the decision issued and due course. Thank you very much.